UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

No. 13-3525 JJO

UNITED STATES OF AMERICA

vs.

WILLIAM JAMES PRICE,
    a/k/a "Ryder,"
    a/k/a "Will,"

        Defendant.
_____/

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to October 14, 2003?  _____ Yes __X__ No

2. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to September 1, 2007?  _____ Yes __X__ No

        Respectfully submitted,

        WIFREDO A. FERRER
        UNITED STATES ATTORNEY

BY:    */s/ Olivia S. Choe*
      Olivia S. Choe
      Assistant United States Attorney
      Court No. A5501503
      99 N.E. 4th Street
      Miami, Florida 33132
      (305) 961-9437 (telephone)
      (305) 536-4676 (facsimile)
      Olivia.S.Choe@usdoj.gov

AO 91 (Rev. 01/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | |
|---|---|
| United States of America<br>v.<br>**WILLIAM JAMES PRICE,**<br>a/k/a "Ryder," a/k/a "Will,"<br><br>*Defendant* | )<br>)<br>)  Case No.  13-3525JJO<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of  3/2013-10/2013  in the county of   Miami-Dade   in the   Southern   District of   Florida  , the defendant violated   18   U. S. C. §  1591(a)(1)  , an offense described as follows:

Sex trafficking of a minor, and by force, fraud, and coercion

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

*Complainant's signature*

FBI Special Agent Regino E. Chavez
*Printed name and title*

Sworn to before me and signed in my presence.

Date:   10/19/2013

*Judge's signature*

City and state:   Miami, Florida

John J. O'Sullivan, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF COMPLAINT

I, Regino E. Chavez, being duly sworn, depose and say:

1. I am a Special Agent with the Federal Bureau of Investigation (FBI), United States Department of Justice. I have worked in this position since November of 2003. I am currently assigned to the Miami Field Office of the FBI and I am a member of the Child Exploitation Task Force (CETF) in South Florida. The CETF is comprised of state, local, and federal law enforcement, including the City of Miami Police Department, Miami-Dade Police Department, Miami Beach Police Department, the City of Fort Lauderdale Police Department, and the Broward Sheriff's Office. The purpose of the CETF is to pursue the Department of Justice's "Innocence Lost National Initiative," which seeks to address the sex trafficking of children. I am presently assigned to handle violent crimes, including offenses involving sex trafficking of children, in violation of Title 18, United States Code, Section 1591; enticing a minor to engage in prostitution, in violation of Title 18, United States Code, Section 2422(b); as well as offenses involving transportation for purposes of prostitution, in violation of Title 18, United States Code, Section 2421. Prior to being assigned to the Miami Field Office, I was assigned to the San Juan Field Office for approximately five (5) years and have participated in investigations involving money laundering and drug trafficking, as well as police corruption and violations of civil rights.

2. I base the facts in this affidavit upon my personal knowledge, as well as knowledge, information, and documentation that I obtained from other law enforcement officers while in my official capacity. I am submitting this affidavit for the limited purpose of establishing probable cause for a criminal complaint against WILLIAM JAMES PRICE (hereinafter, "PRICE"), also known as "Ryder," and "Will." This affidavit does not include every fact that I know about this investigation.

3. On October 17, 2013, the Miami-Dade Schools Police Department (MDSPD),

contacted members of the CETF regarding a minor female, referred to hereinafter as "C.B.," who had approached an MDSPD officer to complain about being a victim of sex trafficking.

4. On October 17, 2013, law enforcement officers interviewed C.B., who stated as follows:

    a. C.B. is currently sixteen years old. For several months, she has been a prostitute, and PRICE was her pimp.

    b. C.B. met PRICE in or around March of 2013 through a mutual friend in the area of Homestead, Florida, at a convenience store called Valentine. At the time, C.B. was fifteen years old. On the day they met, C.B. and PRICE went to PRICE's apartment. At that time PRICE was residing alone at his apartment located in the area of Homestead, Florida. PRICE asked C.B. her age, and C.B. told PRICE that she was fifteen years old. C.B. and PRICE started dating at that time and continued to date for approximately one month. PRICE also went by the names "Ryder" and "Will."

    c. In or around April of 2013, PRICE asked C.B. to make some money for him. C.B. understood this to be a reference to working for PRICE as a prostitute. PRICE told C.B. that she would engage in sexual intercourse. PRICE told C.B. what to charge for her prostitution dates. PRICE told C.B. that she should charge $40.00 for 30 minutes and $60.00 for 60 minutes. C.B. began to engage in prostitution dates in April of 2013 under PRICE's control.

    d. As her pimp, PRICE would tell C.B. where to meet him, and he would pick her up in his car, a black Mustang. C.B. would meet PRICE at around 4:00 pm, after school had finished, and they would drive to an area C.B. described as "the woods" in Homestead. When PRICE and C.B. got to "the woods," PRICE would start

2

communicating via telephone with individuals who wanted to have sexual intercourse with C.B. for money. PRICE would discuss details of the prostitution dates with the individuals, such as the price that would be charged and the type of sexual activity that they would engage in with C.B. C.B. overheard these conversations since she was in the car with PRICE while he was on the telephone.

e. On an average day during April of 2013, C.B. would have five to six clients, and they would typically pay $20.00 for a prostitution date with C.B. C.B. worked Monday through Saturday every week during that month for PRICE. Some of C.B.'s prostitution clients would pay $500.00 for sexual intercourse with C.B. Most of the clients gave the money to PRICE; a few of them would give the money to C.B. When clients gave money to C.B., she would ultimately give the money to PRICE. PRICE provided C.B. with condoms for her prostitution dates. The brand of condoms was Trojan Magnum.[1] C.B.'s prostitution dates would take place in and around "the woods" area. C.B. would exit PRICE's car and get into the cars of prostitution clients. While C.B. was with the clients, PRICE remained nearby in his car. C.B. would work for PRICE until around 10:30 pm. At that time she would either walk or take the public bus back to her home. During April of 2013, PRICE did not give C.B. any money.

f. During May of 2013, C.B. did not work for PRICE out of respect for the fact that her older sister passed away during that month.

g. During June of 2013, PRICE showed up at the home of C.B. and told her it was time to work. C.B. understood PRICE to mean that it was time for her to work

---

[1] Your Affiant is aware that these condoms are sold in and affecting interstate commerce.

for him as a prostitute. When C.B. told PRICE that she did not want to work for him, PRICE hit C.B. in the face. PRICE told C.B. that if she did not work for him as a prostitute he would kill her and her family. C.B. agreed to start working for PRICE again. C.B. once again began to meet with PRICE at approximately 4:00 pm in the afternoon, and PRICE would drive her to "the woods," where he would communicate with prostitution clients via telephone in order to set up dates for C.B.

  h. During June of 2013, C.B. saw approximately ten prostitution clients per day. C.B. worked Monday through Saturday every week during that month for PRICE. Each of those clients would pay $20.00 to $40.00 for sexual intercourse with C.B. Some of the clients would pay $500.00. PRICE would collect the money from most of the clients. PRICE would provide C.B. with condoms for the dates. During June of 2013, PRICE would hit C.B. when she did not make enough money. During this month, PRICE did not give C.B. any money from her prostitution dates.

  i. During July of 2013, C.B. continued to work as a prostitute for PRICE. She continued to meet him at around 4:00 pm, and they would drive to "the woods," where PRICE would coordinate prostitution dates for C.B. During July of 2013, C.B. saw approximately fifteen prostitution clients per day. C.B. worked Monday through Saturday every week during that month for PRICE. Each of the clients paid $40.00 to $180.00 per date. PRICE provided C.B. with condoms for her dates. During July of 2013, PRICE gave C.B. $200.00 from the money she made working for him.

  j. During August of 2013, C.B. continued to work as a prostitute for PRICE. She continued to meet him at around 4:00 pm, and they would drive to "the woods" where PRICE would coordinate prostitution dates for C.B. During August of 2013,

C.B. had approximately three prostitution clients per day. C.B. worked Monday through Saturday every week during that month for PRICE. Each of the clients paid $15.00 to $25.00 per day. PRICE provided C.B. with condoms for her dates. During August of 2013, PRICE did not give C.B. any money from her prostitution dates. Also during August of 2013, PRICE hit C.B. on at least five occasions because she did not make enough money for him working as a prostitute.

    k.    During September of 2013, C.B. did not work for PRICE out of respect for the fact that it was the birthday of her deceased sister. When C.B. told PRICE she did not want to work for him, he hit her in the face and the eye with a closed fist.

    l.    Approximately two weeks ago, C.B. had a chance encounter with PRICE, and PRICE told C.B. that she had to make some money. C.B. understood this to mean that PRICE wanted her to work as a prostitute for him. PRICE threatened to kill C.B. and her family if she refused. C.B. told PRICE that she was going to call the police. PRICE told C.B. that he would kill her. C.B. began to work for PRICE as a prostitute again. During October of 2013, C.B. had three prostitution dates under the control of PRICE.

    m.    During the time that C.B. was engaging in prostitution dates for PRICE, PRICE would give her alcoholic beverages to drink. C.B. was told by several friends of PRICE that he was putting drugs into those alcoholic beverages. Also during the time that C.B. was with PRICE, she had sexual intercourse with PRICE at least five times.

    n.    C.B. provided two telephone numbers for PRICE: XXX-XXX-2099 and XXX-XXX-5766. PRICE would use both of these cellular telephones to communicate

with C.B. C.B. believes PRICE used these cellular telephones to set up her prostitution dates.

5. On October 17, 2013, C.B. provided written consent allowing law enforcement officers to review the contents of her cellular telephone. During a review of C.B.'s cellular telephone, the following text message exchange with PRICE (using phone number XXX-XXX-2099) was discovered. The exchange took place on October 14, 2013.

| | | |
|---|---|---|
| PRICE: | "U gon give me sum money 2day" |
| C.B.: | "Yes bae" |
| PRICE: | "Wat time will this b" |
| C.B.: | "4:05" |
| PRICE: | "Ok" |

C.B. explained that these messages pertained to PRICE asking C.B. to work as a prostitute for him.

6. On October 18, 2013, at approximately 3:42 pm, C.B. made a consensually recorded telephone call to PRICE to XXX-XXX-5766. PRICE asked C.B. where she was. C.B. told him that she was at home. C.B. asked PRICE whether he wanted to make some money. C.B. was referring to working as a prostitute for PRICE. PRICE said yes. C.B. asked PRICE how much money he needed. PRICE asked C.B. whether she was asking how much he wanted her to make. C.B. said yes and asked how much money he needed. PRICE said twenty. C.B. understood this to mean $20.00. C.B. asked PRICE to meet her. C.B. then asked PRICE whether he was going to hit her if she did not make any money. PRICE said that he would not. C.B. asked PRICE to meet her at Valentine. C.B. was referring to the convenience store where she had originally met PRICE. PRICE told C.B. that he did not have a

bicycle and that he was using the bus. C.B. asked PRICE whether he wanted her to walk there. PRICE said yes.

7. On October 18, 2013, at approximately 3:50 pm, law enforcement apprehended PRICE as he was walking towards Valentine in the area of Homestead, Florida.

8. PRICE was interviewed after his arrest and advised of his *Miranda* rights, which he agreed to waive in writing. PRICE advised law enforcement that, among other things, he had met C.B. at Valentine approximately four months ago through a mutual friend. PRICE advised he had been told by C.B. that she was a minor and in eleventh grade in high school. PRICE also advised he was aware that C.B. was a prostitute and that he had seen her getting in and out of cars to engage in her prostitution dates. PRICE admitted he had struck C.B. and that she had given him money. PRICE also admitted his phone number was XXX-XXX-5766 and that he had spoken to C.B. on October 18, 2013 at 3:42 pm using that number. PRICE further admitted to engaging in sexual intercourse with C.B. on at least two occasions.

9. On October 18, 2013, PRICE provided law enforcement with written consent to search the residence where he had resided during the time he first had met C.B. During a search of that residence, 513 SW 6th Avenue Apt. #3, Homestead, Florida, several condom wrappers and at least one used condom where found. The brand of condom wrappers found at the residence was Trojan Magnum.

10. Based upon my training and experience, and as further supported by the facts in this affidavit, I respectfully submit that there is probable cause to believe that PRICE did knowingly, in and affecting interstate and foreign commerce, recruit, entice, harbor, transport, provide, obtain, and maintain, by any means a person, that is, C.B., knowing, and in reckless disregard of the fact, (i) that C.B. had not attained the age of 18 and would be caused to engage

7

in a commercial sex act, and (ii) that means of force, threats of force, fraud, and coercion would be used to cause C.B. to engage in a commercial sex act, in violation of Title 18, United States Code, Section 1591(a)(1). The grounds for this belief include, but are not limited to, the statement of C.B., the text messages found in C.B.'s cellular telephone, the recorded telephonic communication between PRICE and C.B., and PRICE's post-*Miranda* statements. The facility and means of interstate commerce include, but are not limited to, the use of cellular telephones XXX-XXX-2099 and XXX-XXX-5766 and the condoms provided to C.B. by PRICE. I declare under penalty of perjury that the information in this affidavit is true and correct.

                                                  _____
                                                  REGINO E. CHAVEZ, SPECIAL AGENT
                                                  FEDERAL BUREAU OF INVESTIGATION

SUBSCRIBED and SWORN to before me this 19th day of October 2013 in Miami, Florida.

_____
HON. JOHN J. O'SULLIVAN
UNITED STATES MAGISTRATE JUDGE